**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| BRUCE L. BAZINET AND LORI A. BAZINET, | ) ) ) ) | CIVIL ACTION |
| Plaintiffs, | ) ) ) | NO. 4:14-CV-40082-TSH |
| v. | ) ) ) | |
| FORREST THORPE, ROBERT DESROSIERS, AND FRANCIS LEAHY, | ) ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM AND ORDER ON THORPE & DESROSIERS'S MOTION FOR SUMMARY JUDGMENT (Docket No. 56) AND LEAHY'S MOTION FOR SUMMARY JUDGMENT (Docket No. 61)**

**June 3, 2016**

**HILLMAN, D.J.**

This case arises from Bruce and Lori Bazinet's encounter with police on July 29, 2012, which began with Bruce's suicidal behavior and ended with an allegedly falsely procured abuse prevention order and two criminal charges against Bruce. The Bazinets brought suit against several officers from the Paxton police department and the Massachusetts State Police, alleging constitutional and common-law claims. The three remaining defendants move for summary judgment. For the reasons set forth below, Forrest Thorpe and Robert Desrosiers's motion for summary judgment (Docket No. 56) is ***denied***, and Francis Leahy's motion for summary judgment (Docket No. 61) is ***denied.***

**Background**

Lori and Bruce Bazinet (Plaintiffs) are married and reside with their ten-year-old daughter in a house in Paxton, Massachusetts. On July 29, 2012, Lori[1] came home and found Bruce holding a gun and pointing it at his head. After trying unsuccessfully to talk him into putting the gun down, she decided to leave for a while, hoping that he would calm himself. According to Lori, he pointed the gun only at himself, not at her. (Docket No. 74-1 at 22.)

The Bazinets live next door to Robert Desrosiers, who is the Chief of the Paxton Police Department. At some point after Lori found Bruce with the gun, Desrosiers entered his driveway and saw Lori and her daughter, standing in front of his house with his wife, looking upset. Before leaving his vehicle or speaking with Lori, he contacted dispatch, because he "made an assumption that something had gone wrong in [Lori's] house." (Docket No. 74-1 at 4.) Desrosiers testified during his deposition that he and Bruce "were not friends." (Docket No. 74-1 at 5.) Out of concern for his officers, Desrosiers told dispatch to keep all responding Paxton police units away from the Bazinets' home, but to go to the area to observe. Desrosiers also summoned the State Police "STOP" team, which is a specialty unit that is trained to set up perimeters and deal with high-risk entries to homes. (Docket No. 74-1 at 6.) He evacuated some of the neighbors' houses and had responding officers bring the neighbors, his wife, Lori, and the Bazinets' daughter to the police station. (Docket No. 74-1 at 10-12.)

On that same evening, Major Francis Leahy of the State Police was assigned to the Worcester District Attorney's office as commanding officer of the Homicide Unit. He received several telephone calls regarding the incident. When he arrived in the neighborhood, several

---

[1] Because Plaintiffs share a surname, I shall refer to them by their given names for the sake of clarity. I intend no disrespect.

streets were blocked off by police officers. Leahy remained in the outer perimeter but made Desrosiers aware of his presence. The parties dispute whether Leahy or Desrosiers was "in charge" of the scene. The stand-off between the police and Bruce lasted approximately three hours. At some point, Leahy learned that Bruce was suicidal. Desrosiers testified during his deposition that he did not learn until after the stand-off had concluded that Bruce had threatened to kill himself earlier in the day. (Docket No. 74-1 at 14.)

After a peaceful resolution of the stand-off, Bruce was involuntarily committed to Saint Vincent's Hospital for a psychiatric evaluation pursuant to Mass. Gen. Laws ch. 123, § 12. After Bruce was taken to the hospital, Lori spoke with Desrosiers, Leahy, and Detective Forrest Thorpe from the Paxton police. (Docket No. 74-1 at 25-26.) The three officers and Lori dispute the nature of what occurred during this conversation. It is undisputed that, while she was with these three officers, she completed and signed an application for an abuse prevention order (APO) under Mass. Gen. Laws ch. 209A. On the application form, she checked the box indicating that Bruce had placed her in fear of imminent serious physical harm. (Docket No. 58-2 at 2.)

According to the officers, Lori applied for the APO voluntarily. According to Lori, she never asked for an APO and only completed the application because the officers pressured her into doing so. This allegedly occurred in the context of a discussion with Desrosiers and Leahy, in which they said that having Bruce committed under section 12 would not necessarily ensure that he would get the help that he needed, because the hospital could release him. (Docket No. 77-1 at 30-32.) Lori recalled that Desrosiers said "we need to get him on more than just that." (Docket No. 74-1 at 29-30.) According to Lori, Leahy suggested that they report that Bruce had pointed his gun at her and that she had been afraid to leave. (Docket Nos. 74-1 at 30; 77-1 at 31.) Lori testified that the conversation centered on figuring out how to keep Bruce in the hospital. (Docket

No. 77-1 at 41.) Thorpe was writing down a statement while Leahy and Desrosiers were speaking. (Docket No. 77-1 at 31-32.)

Lori testified that one of the three officers—Desrosiers, Leahy, or Thorpe—suggested that she apply for an APO. (Docket No. 77-1 at 33-34, 35-36.) According to Lori, she was told that if she did not do this, the officers could complete the application for her, which would make it look like she was not protecting her daughter, and her daughter could be taken away. (Docket No. 77-1 at 36.) As part of the application, Lori prepared and signed a narrative affidavit, in which she stated that she believed that Bruce had planned to kill himself.[2] (Docket No. 58-4 at 2.) She maintains that this statement was true, but that he never threatened to harm her.

During the conversation between Lori and the officers, Thorpe wrote a "voluntary" statement allegedly given by Lori. (Docket No. 58-5 at 2.) He wrote that Lori had said that Bruce had pointed the gun at her, that she had been in fear for her life, and that she had felt that she could not leave. (Docket No. 58-5 at 2.) Lori testified that, after Thorpe wrote the statement, she signed it, because she had been listening to the officers and was afraid that if she did not sign the statement, Bruce might be released and might not get the help that he needed. (Docket No. 77-1 at 32.) Then she asked to read the statement again and, seeing that it did not reflect what had actually happened, and not wanting to lie, she ripped off the bottom portion of the page where she had signed it. (Docket No. 77-1 at 24-25.)

At 11:30 p.m., a judge entered an emergency APO against Bruce. (See Docket No. 58-6 at 2.) According to Thorpe, he spoke with the judge by telephone for approximately twenty minutes and "gave the gist" of what had occurred earlier in the Bazinets' house but did not directly tell the

---

[2] She stated: "My husband has been distraught and informed me to come pick up my child because he was going to 'take care of his business,' which I felt meant he was going to kill himself and I was afraid for his safety." (Docket No. 58-4 at 2.)

4

judge that Lori had feared for her safety. (Docket No. 74-1 at 42-43.) Thorpe told the judge that negotiators had been used to get Bruce out of the house and that he had been committed under section 12. (Docket No. 74-1 at 43.)

Bruce was served with the APO at St. Vincent's Hospital shortly after it was issued. According to Bruce, he was served around midnight. (Docket No. 74-1 at 57.) According to Desrosiers, Bruce then attempted to contact Lori via telephone, in violation of the APO. (Docket No. 59 at 2.) According to Bruce and Lori, Bruce did not try to contact her after being served with the APO. (Docket No. 74-1 at 34, 57.) Bruce testified that he attempted to contact a friend who was at the Bazinets' house, to instruct the friend to tell the police where he kept his guns, which were ordered seized when Bruce was committed to the hospital. (Docket No. 74-1 at 39, 58.)

The next day, on July 30, 2012, Thorpe wrote an incident report. (Docket No. 74-1 at 62-66.) In the narrative portion of the report, he wrote that Lori had come home to find Bruce pointing a gun at his head, and that Bruce "then pointed the gun in Lori's direction and then back to his head," and that Lori had stated that "she was in fear, frozen, and did not feel she could leave the room." (Docket No. 74-1 at 65.) These statements were nearly identical to those in Lori's "voluntary" statement from the night before. She claims to have torn her signature off of that statement because, according to her, it did not reflect the truth. Thorpe also wrote that Lori had "requested a restraining order and filled out a 209A packet." (Docket No. 74-1 at 65.) Lori denies that she requested a restraining order. (Docket No. 77-1 at 34-36.) Additionally, Thorpe reported that Bruce, after being served with the APO, "made several attempts, via third party, to get messages to his wife," and that he failed to immediately surrender all firearms to the Paxton Police Department, as he was required to do. (Docket No. 74-1 at 65.) Bruce denies that he tried to contact Lori or failed to turn over his guns. (Docket No. 74-1 at 57-58.)

5

Bruce was arrested on July 30, 2012 and charged with: (1) violating the APO, for attempting to contact Lori; and (2) assault and battery with a dangerous weapon, for pointing a gun at Lori. (Docket No. 74-1 at 62.) Bruce spent ten days incarcerated while awaiting a dangerousness hearing. The charges were dismissed by entries of *nolle prosequi* on August 14, 2012 and April 16, 2013. Plaintiffs allege that several local newspapers published articles about the incident and the criminal charges. (Docket No. 1 at 12-14.)

After the events of July 29, 2012, Lori took two months off from work, in part to take care of Bruce, and in part because the incident had been publicized and she was embarrassed. She attended counseling as a requirement to return to work. (Docket No. 77-1 at 28-29.) Bruce testified that no one at his workplace had known about his mental health issues until the incident was publicized. (Docket No. 77-1 at 51.) He also testified that he suffers emotional distress, has less energy, and has lost friends. (Docket No. 77-1 at 52.) His distress is worsened because he lives close to Desrosiers and Leahy and sees their houses regularly. He and Lori are planning to move out of Paxton. (Docket No. 74-1 at 56.)

Bruce and Lori brought this suit against Thorpe, Desrosiers, and Leahy,[3] alleging the following counts: constitutional violations for filing a false police report and APO application by Thorpe and Desrosiers, pursuant to 42 U.S.C. § 1983 (count I); constitutional violations by Thorpe and Desrosiers, pursuant to Mass. Gen. Laws ch. 12, § 11I (MCRA) (count II); intentional infliction of emotional distress by Thorpe, Desrosiers, and Leahy (count IV); supervisory liability of Desrosiers for Thorpe's actions, pursuant to 42 U.S.C. § 1983 (count V); and defamation by

---

[3] Four additional officers, Mark Savasta, Jeffrey Gilbert, John Provost, and James Coyle, were also named as defendants but were later dismissed.

Thorpe (count VI).[4] Desrosiers and Thorpe have moved together for summary judgment. (Docket No. 56). Leahy has moved separately. (Docket No. 61).

## Standard of Review

Rule 56 of the Federal Rules of Civil Procedure provides that the court shall grant summary judgment if the moving party shows, based on the materials in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A factual dispute precludes summary judgment if it is both "genuine" and "material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, (1986). An issue is "genuine" when the evidence is such that a reasonable factfinder could resolve the point in favor of the nonmoving party. *Morris v. Gov't Dev. Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir. 1994). A fact is "material" when it might affect the outcome of the suit under the applicable law. *Id.*

The moving party is responsible for "identifying those portions [of the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). It can meet its burden either by "offering evidence to disprove an element of the plaintiff's case or by demonstrating an 'absence of evidence to support the non-moving party's case.'" *Rakes v. United States*, 352 F. Supp. 2d 47, 52 (D. Mass. 2005) *aff'd*, 442 F.3d 7 (1st Cir. 2006) (quoting *Celotex*, 477 U.S. at 325). Once the moving party shows the absence of any disputed material fact, the burden shifts to the non-moving party to place at least one material fact into dispute. *Mendes v. Medtronic, Inc.*, 18 F.3d 13, 15 (1st Cir. 1994) (citing *Celotex*, 477 U.S. at 325). When ruling on a motion for summary judgment, "the court must view the facts

---

[4] Count III, false arrest/false imprisonment, was against Coyle only, who has been dismissed. Accordingly, count III is also dismissed.

in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Scanlon v. Dep't of Army*, 277 F.3d 598, 600 (1st Cir. 2002) (citation omitted).

## Discussion

### A. *Desrosiers and Thorpe*

The following counts are at issue in Desrosiers and Thorpe's motion for summary judgment: violations of federal and state civil rights pursuant to section 1983 and the MCRA (counts I & II); intentional infliction of emotional distress (count IV); supervisory liability by Desrosiers (count V); and defamation by Thorpe (count VI).

#### 1. *Counts I & II: Qualified Immunity*

Desrosiers and Thorpe argue that they are entitled to qualified immunity on any allegations of federal or state constitutional violations. Qualified immunity protects police officers "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The doctrine provides public officials "breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. Al-Kidd*, 563 U.S. 731, 743 (2011). However, "qualified immunity does not shield public officials who, from an objective standpoint, should have known that their conduct was unlawful." *Haley v. City of Boston*, 657 F.3d 39, 47 (1st Cir. 2011) (internal quotations and citations omitted).

Courts use a two-part test to determine whether qualified immunity applies: (1) whether the facts alleged by the plaintiff make out a violation of a constitutional right; and, if so (2) whether the right was clearly established at the time of the alleged violation. *MacDonald v. Town of Eastham*, 745 F.3d 8, 12 (1st Cir. 2014). Under the second prong of the test, the analysis involves two questions: (1) whether the legal contours of the constitutional right were sufficiently clear;

and (2) whether in the specific factual context of the case, the violation would have been clear to a reasonable official. *Id*. "MCRA claims are subject to the same standard of immunity for police officers that is used for claims asserted under § 1983." *Raiche v. Pietroski*, 623 F.3d 30, 40 (1st Cir. 2010) (citing *Duarte v. Healy,* 537 N.E.2d 1230, 1236 (Mass. 1989)).

    a. *Count I: The § 1983 Claim*

Bruce alleges that Desrosiers and Thorpe were responsible for creating and filing a false police report and procuring a coerced APO, both of which led to his arrest.[5] It is a due process violation for law enforcement officials to fabricate evidence against innocent citizens and place that evidence in a police report. *Limone v. Condon*, 372 F.3d 39, 44-45 (1st Cir. 2004). This constitutional right has been clearly established for over forty years. *Id.* at 45. As the First Circuit has held:

> [I]f any concept is fundamental to our American system of justice, it is that those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit. . . . Actions taken in contravention of this prohibition necessarily violate due process (indeed, we are unsure what due process entails if not protection against deliberate framing under color of official sanction).

*Id.* at 44-45 (internal citation omitted).

Desrosiers and Thorpe's argument focuses solely on the first prong of the qualified immunity analysis. They argue that there was no constitutional violation, because Thorpe's report did not contain any false statements. As support, Desrosiers and Thorpe rely on the fact that Lori completed and signed the APO application. They assert that "[h]er filling out and signing the APO complaint precludes any claim Plaintiffs have that she never requested an APO." (Docket No. 57

---

[5] Although Plaintiffs' claims are pled in general terms, this Court presumes that the constitutional claims are asserted by Bruce only. Neither the facts pled nor Plaintiffs' memorandum suggests otherwise.

at 6.) According to Desrorisers and Thorpe, it was the APO application alone, not the accompanying affidavit or "voluntary" statement, which served as the basis for the judge's issuance of the APO. In response, Plaintiffs point to the disputed facts regarding the APO application. Lori testified during her deposition that she did not ask for or want to apply for an APO and that she did so only at the behest of the officers, under the belief that if she did not do so, Bruce would not get help, and she could lose custody of her child.

Desrosiers and Thorpe further assert that there was no constitutional violation because there was probable cause to arrest Bruce for violating the APO. According to Desrosiers and Thorpe, Bruce violated the APO before Thorpe spoke with Lori and allegedly learned that Bruce had pointed his gun at her. It was the APO violation that initially provided probable cause for arrest, and, according to Desrosiers and Thorpe, the fact that Bruce was later charged with assault and battery with a dangerous weapon "is immaterial because probable cause for arrest for one crime—the APO violation—is probable cause for arrest for another crime." (Docket No. 57 at 6-7.) They cite to *Devenpeck v. Alford*, in which the Supreme Court held that an arrest may be lawful under the Fourth Amendment even if the criminal offense for which there is probable cause to arrest is not "closely related" to the offense stated by the arresting officer at the time of arrest. 543 U.S. 146, 148, 153-56 (2004). Thus, Desrosiers and Thorpe argue that because there was probable cause to arrest Bruce for violating the APO, there can be no constitutional violation for falsely arresting him for assault.

Thorpe and Desrosiers's argument ignores the significant factual disputes in this case, which are central to the issue of whether they violated Bruce's constitutional rights. Bruce and Lori testified that Bruce did not attempt to contact her after he was served with the APO. Thus, the factual predicate for probable cause for the APO-violation charge is in dispute, not to mention

the factual issue of whether the APO itself was lawfully procured. Moreover, Plaintiffs do not merely challenge Bruce's arrest for lack of probable cause; they allege that both charges were based on lies, which Thorpe and/or Desrosiers concocted, and which Thorpe wrote in his official report. This conduct, if true, would constitute a due process violation. *See Limone*, 372 F.3d at 44-45. Desrosiers and Thorpe are not entitled to qualified immunity on count I.

### b. *Count II: The MCRA Claim*

The Massachusetts Civil Rights Act (MCRA) provides a cause of action against a person who has "interfere[d] by threats, intimidation or coercion" with the exercise of rights secured by the state or federal constitutions or laws. Mass. Gen. Laws ch. 12, §§ 11H, 11I. In order to establish a claim under the MCRA, a plaintiff "must prove that (1) [his or her] exercise [or] enjoyment of rights secured by the Constitution or the laws of either the United States or the Commonwealth, (2) have been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by threats, intimidation or coercion." *Roman v. Trustees of Tufts Coll.*, 964 N.E.2d 331, 337 (Mass. 2012) (quoting *Kennie v. Natural Resource Dep't of Dennis,* 889 N.E.2d 936, 940-41 (Mass. 2008)).

The MCRA "was enacted in response to deprivations of secured rights by private individuals using violence or threats of violence amounting to racial harassment." *Planned Parenthood League of Massachusetts, Inc. v. Blake*, 631 N.E.2d 985, 990 n.8 (Mass. 1994). A direct violation of a person's rights does not implicate the MCRA unless it also involves threats, intimidation, or coercion that interferes with the person's exercise or enjoyment of rights secured by law. *Id.* at 989; *Longval v. Comm'r of Correction*, 535 N.E.2d 588, 593 (Mass. 1989); *Pheasant Ridge Assocs. Ltd. Partnership v. Burlington,* 506 N.E.2d 1152, 1158-59 (Mass. 1987). To be actionable, a defendant's actions must amount to "an attempt to force someone to do something

11

the person is not lawfully required to do." *Freeman v. Planning Bd. of W. Boylston,* 646 N.E.2d 139, 149 (Mass. 1995); *see Blake*, 631 N.E.2d at 988, 990.

Desrosiers and Thorpe argue that "Plaintiffs have not shown any threats, intimidation nor [*sic*] coercion against them by the Defendants." (Docket No. 57 at 7.) For purposes of the MCRA, a "threat" is "the intentional exertion of pressure to make another fearful or apprehensive of injury or harm." *Blake*, 631 N.E.2d at 990. "Intimidation" involves putting a person "in fear for the purpose of compelling or deterring conduct." *Id.* "Coercion" means "the application to another of such force, either physical or moral, as to constrain [her] to do against [her] will something [she] would not otherwise have done." *Id.* (citations omitted).

Here, the record contains evidence that Lori was coerced into applying for the APO and signing the "voluntary" statement, the substance of which was reproduced in the police report. She testified that she executed the APO application under fear of having her daughter taken away, and that she initially signed the "voluntary" statement because the officers told her that Bruce could be released if she did not do so. "Threatening, intimidating, or coercive actions directed at third parties should be included in considering any conduct that forms the basis of a claim under the civil rights act." *Haufler v. Zotos*, 845 N.E.2d 322, 334 (Mass. 2006); s*ee Bell v. Mazza*, 474 N.E.2d 1111, 1113-14 (Mass. 1985); *Ayasli v. Armstrong,* 780 N.E.2d 926, 936-37 (Mass. App. Ct. 2002). Thus, construing the record in the light most favorable to Plaintiffs, a reasonable jury could find that Thorpe and Desrosiers interfered with Bruce's constitutional rights by way of threats, intimidation, and coercive tactics against Lori, which resulted in the false APO and police report. Desrosiers and Thorpe are not entitled to summary judgment on count II.

*2. Count V: Supervisory Liability*

Plaintiffs allege that Desrosiers, as Chief of Police, should have prevented Thorpe from filing a false report.  A claim for supervisory liability under section 1983 has two elements. "[F]irst, the plaintiff must show that one of the supervisor's subordinates abridged the plaintiff's constitutional rights." *Guadalupe-Baez v. Pesquera*, -- F3d --, No. 14-2304, 2016 WL 1592690, at *3 (1st Cir. Apr. 20, 2016).  "Second, the plaintiff must show that 'the [supervisor]'s action or inaction was affirmative[ly] link[ed] to that behavior in the sense that it could be characterized as supervisory encouragement, condonation, or acquiescence or gross negligence amounting to deliberate indifference.'" *Id.* (quoting *Pineda v. Toomey,* 533 F.3d 50, 54 (1st Cir. 2008)) (citation omitted).  "Mere negligence will not suffice: the supervisor's conduct must evince 'reckless or callous indifference to the constitutional rights of others.'" *Id.* (quoting *Febus–Rodríguez v. Betancourt–Lebrón,* 14 F.3d 87, 92 (1st Cir. 1994)).

"[A] supervisor may not be held liable under section 1983 on the tort theory of respondeat superior, nor can a supervisor's section 1983 liability rest solely on his [or her] position of authority." *Id.*  However, although "the supervisor's liability must be premised on his [or her] own acts or omissions," the supervisor need not have "directly engage[d] in a subordinate's unconstitutional behavior." *Id*.  When a plaintiff relies on a theory of deliberate indifference, she must show "(1) that the officials had knowledge of facts, from which (2) the official[s] can draw the inference (3) that a substantial risk of serious harm exists." *Id.* at *4 (quoting *Ramirez-Lluveras v. Rivera-Merced*, 759 F.3d 10, 20 (1st Cir. 2014)) (quotation marks and citations omitted).  Additionally, there must be a solid causal link between the supervisor's conduct and the constitutional violation. *Id.*

13

Desrosiers argues that, even if Thorpe violated Bruce's constitutional rights, "Plaintiffs have failed to prove that Desrosiers had anything to do with Thorpe's procurement of the APO, much less Thorpe's writing of his incident report." (Docket No. 57 at 8.)  This statement is contradicted by Lori's testimony.  She testified that one or more of the three officers who spoke to her after Bruce was taken to the hospital—including Desrosiers—conceived of the idea that she should apply for an APO as a means of ensuring that Bruce would remain in the hospital.  She testified that the officers were discussing ways in which Bruce could be held for a longer period of time, including concocting a kidnapping charge or falsely stating that he had threatened Lori with his gun.  Although Thorpe ultimately wrote Lori's alleged statement, she testified that he did so in the context of an ongoing conversation between Leahy and Desrosiers.  Thorpe's report, written the following day, contained the same allegations against Bruce that were in Lori's "voluntary" statement, which was constructed during the conversation involving all three officers.  Thus, a reasonable jury could find that Desrosiers was involved in the genesis of Thorpe's report and acquiesced in Thorpe's violation of Bruce's rights.  Desrosiers is not entitled to summary judgment on count V.

   3. *Count IV: Intentional Infliction of Emotional Distress*

Under Massachusetts law, a claim for Intentional Infliction of Emotional Distress (IIED) requires proof of the following elements: (1) that Defendant "intended, knew, or should have known that his conduct would cause emotional distress; (2) that the conduct was extreme and outrageous; (3) that the conduct caused emotional distress; and (4) that the emotional distress was severe." *Polay v. McMahon*, 10 N.E.3d 1122, 1128 (Mass. 2014).  "Liability cannot be predicated on mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities, nor even is it enough that the defendant has acted with an intent which is tortious or even criminal, or that

he has intended to inflict emotional distress, or even that his conduct has been characterized by malice, or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort." *Id.* (quoting *Tetrault v. Mahoney, Hawkes & Goldings*, 681 N.E.2d 1189, 1197 (Mass. 1997)) (quotation marks and citations omitted).  The conduct at issue must go "beyond all possible bounds of decency, and [be] regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (quoting *Roman v. Trustees of Tufts College*, 964 N.E.2d 331, 341 (Mass. 2012)) (citation omitted).

Desrosiers and Thorpe argue that Plaintiffs have "failed to meet the threshold for succeeding" on their IIED claim because "[n]one of the actions by the Defendants can be viewed as 'extreme and outrageous' and 'beyond all possible bounds of decency.'" (Docket No. 57 at 9.)

The material facts underlying this charge are in dispute.  In the light most favorable to Plaintiffs, the alleged conduct against Bruce—police officers fabricating evidence in an effort to obtain criminal charges against an innocent citizen who was in the midst of a suicidal breakdown—would be sufficient to meet the high standard for a claim of IIED.  This conclusion is supported by case law from this jurisdiction and others. *See Limone v. United States*, 497 F. Supp. 2d 143, 227 (D. Mass. 2007), *aff'd on other grounds*, 579 F.3d 79 (1st Cir. 2009) (finding that framing of innocent men by law enforcement officials was extreme and outrageous conduct for purposes of intentional infliction of emotional distress); *see also, e.g., Alexander v. United States*, 721 F.3d 418, 425 (7th Cir. 2013); *Pitt v. D.C.*, 491 F.3d 494, 506 (D.C. Cir. 2007); *Bender v. City of New York*, 78 F.3d 787, 791 (2d Cir. 1996).  Likewise, the officers' treatment of Lori, which involved coercing her into filing a false APO against her mentally-ill husband, could constitute a claim for IIED.  Accordingly, Desrosiers and Thorpe are not entitled to summary judgment on count IV.

*4. Count VI: Defamation*

To prevail on a claim for defamation, a plaintiff must establish that (1) the defendant made a statement about the plaintiff to a third party; (2) the statement could damage the plaintiff's reputation in the community; (3) the defendant was at fault in making the statement; and (4) the statement either caused the plaintiff economic loss, or is actionable without proof of economic loss. *Ravnikar v. Bogojavlensky*, 782 N.E.2d 508, 510-11 (Mass. 2003). It is well-established in Massachusetts that statements imputing criminal conduct are actionable without proof of economic loss. *See id.*

Plaintiffs allege that Thorpe concocted and disseminated a false police report and APO packet that imputed criminal conduct to Bruce.[6] Plaintiffs also allege that these false statements were republished by numerous third-party news outlets. Thorpe's sole argument for summary judgment is that the defamation claim rests on newspaper publications of the incident, for which he was not responsible. This argument misconstrues Bruce's claim, which is based not only on the newspaper publications but also on the police report itself. "Publication" in the context of defamation means that the defamatory statement was shared with a third party. *Id.* at 510. A reasonable jury could find that Thorpe shared the police report and APO packet with someone other than himself. Accordingly, Thorpe is not entitled to summary judgment on count VI.

## B. *Leahy*

The only count against Leahy is for intentional infliction of emotional distress. Leahy argues that the facts set forth in the complaint do not implicate him and that Plaintiffs have failed to show that they suffered emotional distress as a result of the incident. In response, Plaintiffs

---

[6] For the same reasons that apply to the constitutional claims, this Court presumes that the defamation claim is asserted by Bruce only.

argue that there are disputed facts regarding Leahy's involvement in the allegedly false report and APO. Regarding emotional distress, Plaintiffs point to Bruce's testimony that he is unable to return to work; he feels lethargic; he has lost friends; he is unable to enjoy time with his family; and he feels embarrassed and does not like to leave his house. He is under the care of two mental-health doctors and, whereas before July 29, 2012 he was prescribed just one medication, now he takes several. As for Lori, she testified that she took leave from work; she attended counseling sessions; and she suffers from public embarrassment.

The record reveals disputes of material fact regarding Leahy's involvement in the allegedly outrageous conduct at issue, as well as the resulting emotional harm. Leahy testified that his involvement in the incident was limited to a brief conversation with Lori, in which he asked her whether Bruce had held her against her will. (Docket No. 62-1 at 2.) Lori, on the other hand, testified that Leahy and Desrosiers jointly concocted the underpinnings of the false report. During her deposition, she testified that Leahy brought up the potential kidnapping issue as a means of ensuring that Bruce would not be released from the hospital, and that he suggested that she say that Bruce had pointed his gun at her, even though she adamantly denied that this happened or that she had been held against her will. (Docket Nos. 74-1 at 30; 77-1 at 30-32, 42, 43.) She further testified that one of the three officers—including Leahy—told her that Bruce might be released if she did not apply for an APO, and that her daughter could be taken away. (Docket No. 77-1 at 33-34, 36.)

I do not make credibility determinations at this stage of the proceedings, and I must view the disputed factual allegations in the light most favorable to Plaintiffs. Construing the record in this light, a reasonable jury could find that Leahy was involved in the conduct that led directly to

the allegedly false report, and that Plaintiffs suffered severe emotional distress as a result of this incident. Accordingly, Leahy's motion for summary judgment will be denied.

## Conclusion

For the reason set forth above, Thorpe and Desrosiers's motion for summary judgment (Docket No. 56) is ***denied***. Leahy's motion for summary judgment (Docket No. 61) is ***denied***. Because James Coyle and Jeffrey Gilbert have been voluntarily dismissed from this suit, count III is hereby dismissed.

**SO ORDERED.**

> **/s/ *Timothy S. Hillman***
> **TIMOTHY S. HILLMAN**
> **DISTRICT JUDGE**